# In the United States Court of Federal Claims

No. 02-1222T
(Consolidated with No. 05-18T)
(Filed: November 24, 2015)

* * * * * * * * * * * * * * * * * * * * *

ROBERT A. MANDICH and
CAROL J. MANDICH,

                 *Plaintiffs*,

v.

THE UNITED STATES,

                 *Defendant*.

* * * * * * * * * * * * * * * * * * * * *

| |
|---|
| TEFRA; Settlement; Notice of Deficiency; Computational Adjustment; Affected Item; 26 U.S.C. § 465; At Risk Limitation; 26 U.S.C. § 469; Passive Activity Limitation; Doctrine of Variance |

_____

*Thomas E. Redding,* Houston, TX, with whom was *Sallie W. Gladney*, Houston, TX, for plaintiffs.

*Benjamin C. King*, United States Department of Justice, Tax Division, Washington, DC, with whom were *Mary M. Abate*, Assistant Chief, *David I. Pincus*, Chief, Court of Federal Claims Section, and *Caroline D. Ciraolo*, Principal Deputy Assistant Attorney General, for defendant.

_____

## OPINION

_____

BRUGGINK, *Judge*.

This is a suit for refund of federal income tax and interest. Taxpayers, Robert and Carol Mandich ("the Mandiches" or "taxpayers"), filed two suits here seeking refunds. The cases have been consolidated. Both cases involve the same settlement agreement between the Mandiches and the Internal Revenue Service ("IRS") regarding their investment in the Greenberg Brothers Partnership #12, also known as Lone Wolf McQuade Associates ("LWM"), which was the subject of a Final Partnership Administrative Adjustments ("FPAA") under the Tax Equity and Fiscal Responsibility Act of 1982

("TEFRA").  26 U.S.C. §§ 6221-6233 (2012).  Instead of participating in the LWM partnership proceeding, the Mandiches settled their partnership items with the IRS.  Then the IRS made computational adjustments to the Mandiches taxes for the years at issue to implement the terms of the agreement.  These adjustments resulted in a tax deficiency, which plaintiffs paid.  In their first suit, filed on September 18, 2002, plaintiffs allege that the IRS was barred from disallowing certain carryover credits because it had not timely issued a notice of deficiency as required by statute.  The carryover credits impact tax years 1984, 1990, 1991, 1992, 1993, 1994, and 1995.  The second lawsuit, filed on January 6, 2005, asserts that the IRS disallowed the application of suspended losses for tax years 1993-1995 in violation of the terms of the settlement agreement.  The Mandiches claim that proper application of the settlement agreement to their carryover credits and suspended losses entitles them to a refund of tax and interest paid in the amount of $219,685.76.[1]  The government contests plaintiffs' allegations and stands by the adjustments calculated by the IRS in 2000.

This was one of several Greenberg Brothers partnerships that were the subject of litigation in this court.  *Bush, et al. v. United States*, 78 Fed. Cl. 76 (2007), *affd.*, 655 F.3d 1323 (Fed. Cir. 2011) ("*Bush I*"), was selected as a test case for the purpose of resolving a TEFRA issue common to the Greenberg Brothers partnership cases, including this case, namely, whether the IRS needed to issue notices of deficiency before assessing taxes as a result of adjustments flowing from partner-level settlements of the audit of the partnership in question. The undersigned held that deficiencies assessed against the Bushes as a result of settlement of their at-risk amount was a computational adjustment for which no additional notice of deficiency was required because no partner-level factual determinations were necessary. *Id.* at 81-82.  Next, Judge George Miller construed the language of one of the settlement agreements and held that losses suspended under § 465 pursuant to the terms of the agreement were subject to the restrictions in § 469 on the use of passive losses.  *Bush v. United States,* 84 Fed. Cl. 90 (2008) ("*Bush II*"). The parties disagree about the effect of the *Bush* decisions on this case, however.

---

[1] This is the amount that plaintiffs demand in their first amended complaint, which was filed on February 10, 2014, in the lead case after the cases were consolidated.

In addition to the complexities inherent in determining tax liabilities for several years involving inter-related questions of both credits and losses and multiple settlement agreements, the case is complicated by the fact that some of the credits to which taxpayers claim entitlement are traceable to pre-TEFRA partnerships and that the law concerning the interplay between §§ 465 and 469 has arguably changed since Mr. Mandich first invested in LWM. As if these factors did not involve sufficient complexity, the parties' arguments have changed over time.

Both parties moved for summary judgment on what eventually became three distinct issues. The briefing has been extensive and there were two oral arguments. The matter is now ready for resolution. For the reasons set out below, we grant in part and deny in part both parties' motions for summary judgment.

## BACKGROUND[2]

I.     Tax Years 1984-1996

From 1983 until 1995, Mr. Mandich was a limited partner in Lone Wolf McQuade. LWM was the subject of a partnership proceeding beginning in July of 1991 pursuant to TEFRA. During a TEFRA partnership proceeding, the IRS audits the partnership and makes certain partnership-level determinations, the impact of which flow through to the individual partners who are responsible for reporting those items on their individual income tax returns because the partnership is not a taxable entity. The Mandiches chose to opt out of the LWM partnership proceeding by settling with the IRS. *See* 26 U.S.C. § 6224(c) (providing that a partner may settle his or her partnership items with the IRS through a binding agreement). On August 7, 1999, the IRS and the Mandiches executed the "Form 906 Closing Agreement on Final Determination Covering Specific Matters" ("Closing Agreement") regarding LWM. In the Closing Agreement, the parties agreed to the following:

1. No adjustment to the partnership items shall be made for the taxable years 1983 through 1995 for purposes of this settlement.

---

[2] The facts are derived from the attachments to the parties' cross-motions for summary judgment. Relevant disputed facts are noted in the background section.

2. The taxpayers are entitled to claim their distributive share of the partnership losses for 1983 through 1995 only to the extent they are at risk under I.R.C. § 465.

3. The taxpayers' amount at risk for 1983 through 1986 is their capital contribution to the partnership.

4. The taxpayers' capital contribution to the partnership is $100,000.

5. Taxpayers' qualified investment for computing investment tax credit is the amount at risk set forth in paragraph #4.

6. The taxpayers are not at risk under I.R.C. § 465 for any partnership notes, entered into by the partnership to acquire rights in the motion picture Lone Wolf McQuade and Strange Invader, whether or not assumed by the taxpayers. Any losses disallowed under this agreement are suspended under I.R.C. § 465. Such suspended losses may be used to offset the taxpayers' pro rata share of any income earned by the partnership and/or other income in accordance with the operation of I.R.C. § 465.

. . . .

8. To the extent the partnership earns net income the taxpayers' [amount] at risk will be increased in accordance with I.R.C. § 465.

. . . .

12. Any deficiency in tax determined under this agreement will be subject to adjustments arising from a carryback or carryforward from other taxable years of any loss, credit or other tax attribute as allowed by the Internal Revenue Code.

Pls.' Mot. Sum. J. Ex. E at 14-15. The agreement thus presumptively limited the amount of losses the Mandiches could claim with respect to LWM, as well as the amount at risk for purposes of calculating credits to $100,000, and it established the terms by which the amount at risk for calculating losses and credits could be increased in the future.

4

On May 22, 2000, the IRS sent two letters to the Mandiches that reflected adjustments the IRS made to their tax returns for 1984 through 1989 in light of the Closing Agreement. Attached to each letter were IRS forms 4549A-CG, 886-A, and others adjusting income, deductions, and, when applicable, credits. The first letter covered tax years 1983-1985, although 1984 was the only year in which the calculations triggered a tax deficiency. The IRS disallowed LWM schedule E losses in excess of $100,000 in 1983, which corresponded to the capital contribution and amount at risk permitted in the LWM Closing Agreement. For 1984, the IRS disallowed $73,194 of LWM schedule E losses, which increased the Mandiches' taxable income to $47,238. After computing the tax, applying a political contribution credit, a general business credit, a special fuels credit, and applying the alternative minimum tax, the IRS concluded that the Mandiches owed $7,869 in tax for 1984. The IRS estimated the interest due on this amount to be approximately $34,000. The forms also reflected the disallowance of $66,885 of LWM schedule E losses in 1985, which did not change the amount of tax the Mandiches owed in that year. Plaintiffs paid the assessment.

The second May 22, 2000 letter covered tax years 1986-1989. It provided that the IRS made no adjustments to the 1987 and 1988 returns but reduced the amount of carryover stemming from the investment credits. In the letter, the IRS stated the following:

> We have ordered your 1990 through 1996 returns. It appears that the credit shown on your 1989 account was used on these years. You may want to send us copies of your 1990 through 1996 tax returns, as we may not have the documents any longer. If we are unable to secure copies of your returns, we will make adjustments from the information available.

Pls.' Mot. Sum. J. Ex. L at 100.

At this point it becomes necessary to interject other background facts not directly related to the LWM partnership Closing Agreement in order to explain plaintiffs' subsequent actions. The Mandiches had been invested in a number of partnerships other than LWM, some of which triggered earlier Tax Court litigation. Although the record is less than clear, there were at least two settlement agreements coming out of that litigation and at least one judgment of the Tax Court. Some documents relating to the Tax Court litigation are available for tax years 1982 to 1983, but neither party is able to

locate plaintiffs' tax returns prior to 1984, and the Tax Court records are very limited. It is, however, undisputed that the net result of the litigation was that some credits were disallowed, although the parties disagree about the extent of that disallowance. The key point is that, with respect to the years at issue here, plaintiffs initially had not attempted to use whatever credits they believed survived the Tax Court litigation because their income, in their view, was offset sufficiently by LWM losses. The credits suddenly became relevant, again, after the LWM settlement, because it had the effect of reducing losses from $311,874 to $100,000 (unless the Mandiches could demonstrate an increased amount at risk). In plaintiffs' view, they were able to utilize carryover credits from prior years, not withstanding the Tax Court litigation, in order to deflect the decrease in available losses attributable to LWM.

In July of 2000, the taxpayers responded to the IRS's adjustments to losses for 1983 through 1985. They disagreed with the IRS with respect to whether they were limited by the LWM Closing Agreement in the use of the approximately $200,000 in suspended losses. As a result, on July 25, 2000, they filed amended tax returns for 1993-1996, seeking a refund of $4,748 in 1993, a refund of $2,826 in 1994, and a refund of $68,555 in 1995. The taxpayers' proposed adjustments took into account the use of suspended losses and increases in the amount of investment tax credit available in 1995 due to changes in the corresponding amount at risk. *See id.* Ex. F at 067-68.

On July 27, 2000, the IRS sent another letter to the Mandiches, this one adjusting their taxes in 1990-1996. The taxpayers' 1990-1996 tax returns had shown a carryover credit of $102,798.00. The forms accompanying the July 27 IRS letter reflected that the IRS disallowed the investment tax credit carryover for each year because of adjustments made for previous years which had, in the view of the IRS examiner, reduced the investment credit to zero. After reviewing the 1983 through 1989 tax years, the examiner noted rather cryptically that, "cases and per information found[,] appeals disallowed research credit in 1982 and partnership adjustment in 83 and 84 reduced large amount of [carryover]. Only small amounts were created in 83-86 AP all of the credit is used in 1989 with no [carryover]." *Id*. at Ex. N at 143. As has become apparent in briefing here, by concluding that taxes were due for 1982, the IRS examiner must have also taken the position that no credits could have survived the Tax Court litigation.

Because the IRS concluded that the carryover losses had been fully depleted in 1989, on July 31, 2000, it assessed the following tax deficiencies:

$8,637 in tax and $10,284.20 in interest for 1990; $10,770 in tax and $10,645.59 in interest for 1991; $14,540 in tax and $12,297.76 in interest for 1992; $17,691 in tax and $12,755.47 in interest for 1993; $21,509 in tax and $12,535.50 in interest for 1994; $14,685 in tax and $6,518.98 in interest for 1995; and $4,932 in tax and $1,591.23 in interest for 1996.  Plaintiffs paid the assessment.

The government concedes that a notice of deficiency was not issued prior to the July 31, 2000 assessment.  It takes the position that it was unnecessary for the IRS to issue a notice, however, because the agency had no need to question plaintiffs' continued preservation of carryover credits until after the IRS had disallowed losses pursuant to the LWM Closing Agreement.  In other words, defendant contends that the IRS was merely making computational adjustments when it applied the LWM Closing Agreement to taxpayers' attempted use of credits in place of losses.

On September 18, 2000, the IRS denied the Mandiches' July 25, 2000 request for refund based on the assertion of suspended losses.  The IRS explained its conclusion as follows:

> Your claim is based on the view that you have an increase in capital.  To allow the claims, you must provide verification of the increase in capital such as cancelled checks, cash vouchers and/or cash transactions.  Investment credit was limited per the 906 [Closing Agreement] and the amount allowed has been used in prior adjustments.

*Id*. Ex. J at 084.

Plaintiffs filed another round of amended tax returns (Form 1040X) and claim for refund (Form 843) on October 08, 2002, for tax years 1984, 1986, and 1990-1996, which the IRS denied.

### *Prior Litigation Regarding Robert A. Mandich's 1981-1983 Taxes*

The IRS examiner's July 27, 2000 note concerning previous cases and appeals most likely referred to the Tax Court case involving Robert A. and

Marguerite Mandich.[3]  This prior litigation began in October of 1987 after the IRS sent a notice of adjustment to Robert and Marguerite Mandich for tax years 1982 and 1983.  According to the IRS' Examination Information Report, the deficiencies in 1982 resulted from adjustments that the IRS made to losses claimed for Mara Investment Company and for Summer Lovers Partnership, and the disallowance of investment and business energy credits attributable to Saxon Energy and Summer Lovers Partnership.  The adjustments allowed an investment credit of $1,471.  In total, the adjustments resulted in Robert and Marguerite owing $37,956 in taxes for 1982.

For 1983, the IRS made an upward adjustment to Robert and Marguerite's income by recognizing income from the IREX Partnership and disallowing losses from Mara Investment Company.  However, these adjustments did not affect Robert and Marguerite's ultimate tax liability for 1983 because their income remained negative.  The examiner's work papers for 1983 contain the following note: "Two partnerships in which you are an investor, Summer Lovers Associates and Lone Wolf McQuade Associates, are currently under examination under TEFRA proceedings.  Consequently, there may be additional adjustments to your 1983 return in connection with the on-going examinations."  Def.'s Cross-Mot. Sum. J. at A-62.

In the work papers attached to the 1987 Examination Information Report, which explain the 1982 and 1983 adjustments, the IRS determined that a $15,038 "[i]nvestment tax credit from the Children's Classics Recording promotion[,] which was claimed on [Robert and Marguerite's] 1981 tax return and subsequently carried forward to [their] 1982 and 1983 returns, has been disallowed in full per the 1981 appeals settlement dated Jan 7, 1987."  Id. at A-58.  Similarly, the IRS disallowed a $19,814 research and development credit claimed by Robert and Marguerite for activities conducted by Cocoa, Ltd.  The IRS auditor also explained that all credits generated by the Summer Lovers Partnership, which were shown in the amount of $4,593,978.00, were disallowed in any amount that exceeded income from the activity at issue.  Finally, all carryforward or carryback Saxon Energy credits were also disallowed.

---

[3] In 1982 and 1983, Robert A. Mandich was married to Marguerite, and they filed a joint tax return.  Marguerite is not a party to this action.  Mr. Mandich filed his taxes separately in 1984 and 1985.  By 1986, Mr. Mandich began filing jointly with his current wife, Carol, who is a party to this suit.

Upon receiving the adjustment to their 1982 and 1983 tax returns, Robert and Marguerite filed suit in the Tax Court. That litigation was resolved in 1993 through settlement.

Although the Tax Court did not retain many of the records from Robert and Marguerite's suit regarding their 1982-1983 returns, it did keep the order reflecting how the case was resolved. Specifically regarding the Saxon Energy Credits, the Tax Court adopted the parties' stipulated settlement on January 26, 1993. Pursuant to the settlement, Marguerite and Robert Mandich agreed that the resolution of *Schillinger v. Commissioner*, 60 T.C.M. (CCH) 1470 (1990), would control and that the formula used in that case would apply to determine the proper adjustments to the Saxon Energy items. Def.'s Cross-Mot. Sum. J. at A-73. Additionally, the parties agreed to the following:

> If the Saxon Energy issues in the Controlling Case are resolved in a manner which affects the same issues in other years (e.g., the availability of investment tax credit or energy credit carrybacks or carryforwards) the resolution will apply to petitioners' other years as if the petitioners in this case were the same as the taxpayers in the Controlling Case.

*Id*. at A-74.

Robert and Carol Mandich entered into a Form 906 Closing Agreement with the IRS, dated May 13, 1993 ("1993 Closing Agreement"), settling their partnership issues with respect to Summer Lovers Associates. Specifically, the parties agreed to the following:

> WHEREAS taxpayers are limited partners in the partnership known as Summer Lovers Associates.

> WHEREAS taxpayers have claimed a deduction, in the amount of $55,287.00 for their distributive share of the loss claimed by Summer Lovers Associates for the taxable year ended December 31, 1982.

> WHEREAS it is desirable for Federal income tax purposes to agree on certain matters pertaining to taxpayers['] partnership interest.

9

Now it is hereby determined and agreed for Federal income tax purposes:

1. That the taxpayers['] initial amount at risk is $50,000.00.

2. That the taxpayers are entitled to claim investment tax credit of $5,000.00 for 1982.

3. That the taxpayers are allowed to claim a loss from Summer Lovers Associates in 1982 in the amount of $50,000.00.

4. That the losses disallowed because they exceed the amount at risk will be carried forward in accordance with I.R.C. § 465.

5. To the extent the partnership earns net income after 1982, the at risk amount will be increased in accordance with I.R.C. § 465.

6. The taxpayers are not liable for any additions to tax with respect to their investment in Summer Lovers Associates.

. . . .

Pls.' Resp. Ex. LL at 245-46.  On May 27, 1993, the Tax Court entered a decision in Marguerite and Robert Mandich's case adopting the parties' agreement recognizing a tax deficiency of $9,811.00 in 1982.

While the suit involving tax years 1982 and 1983 awaited resolution in the Tax Court, the IRS continued to audit the taxpayers' other returns.  In 1988, the IRS examined Mr. Mandich's 1985 return and found "a $19,814.00 Research Activities credit on form 6765 of your 1985 tax return as a carryforward from prior years.  Since this credit (from Cocoa, Ltd.) was disallowed in full in your appeals settlement for your 1981 tax return, it is not allowable in 1985 or in any other tax year."  Def.'s Cross-Mot. Sum. J. at A-416.  Also during this 1988 review, the IRS concluded that the taxpayers' 1986

tax return did not appear to present sufficient audit potential and it was therefore accepted as filed.

As described earlier, in 1991, the IRS issued an FPAA concerning the LWM partnership, which affected plaintiffs' taxes from 1983 to 1995. Plaintiffs filed suit here on September 18, 2002, and again on January 6, 2005, claiming entitlement to refunds of taxes and penalties paid with respect to tax years 1984, and 1990-1995.

## DISCUSSION

Over the course of four rounds of briefing and two oral arguments, three questions have come into focus. First, whether taxpayers may, in the absence of 26 U.S.C. § 469 but pursuant to § 465 and certain IRS Forms, use suspended losses to offset ordinary income for tax years 1993-1995. Both code sections provide for limitations on the use of losses. Section 469 limits the investor's use of losses based on the characterization of his participation in the investment entity as either passive or non-passive. Section 465 limits the investor's use of losses to the amount at risk in the activity. These code sections are typically applied together, but the parties agree that § 469 does not apply in the precise circumstances of this case. Second, whether the IRS performed a computational adjustment when it disallowed taxpayers' carryover credits in years 1984 and 1990-1995, which were traceable to previous Tax Court cases and settlements. If this disallowance is not fairly characterized as a computational adjustment flowing from the LWM Closing Agreement, then the IRS was statutorily obligated to serve taxpayers with a notice of deficiency within 3 years, which would have triggered the taxpayers' right to dispute the adjustment. The parties agree that the statute of limitations presently bars the IRS from issuing the notice of deficiency. Third, whether the IRS improperly disallowed all investment tax credits generated by Mr. Mandich's investment in LWM rather than simply reduce the amount of credits to $10,000 per the terms of the LWM Closing Agreement. We address each issue separately.

I.      Suspended Losses and Section 465

Plaintiffs contend that they are entitled to refunds for 1993-1995 based on using losses from the LWM partnership that were disallowed for 1983-1986 and suspended for future use pursuant to § 465 to offset non-LWM income they reported for 1993-1995.

11

On their original returns plaintiffs had reported net passive income from LWM of $11,167 for 1993, $10,092 for 1994 and $20,469 for 1995, which they claimed was offset by LWM passive losses in those years.  On July 25, 2000, plaintiffs filed Forms 1040X for 1993, 1994 and 1995, claiming, *inter alia*, deductions against other income traceable to the suspended losses of $11,167, $10,092 and $20,469.  Plaintiffs' computations of the refunds due for 1993, 1994, and 1995, attributable solely to the deductions equal to the net income reported from LWM after their partial concession, are $4,555, $3,997 and $8,106.  The parties agree that the outcome turns on interpretation of the LWM Closing Agreement in light of applicable law.

The LWM Closing Agreement contains three provisions directly bearing on the suspended loss claims:

> 6. . . . . Any losses disallowed under this agreement are suspended under I.R.C. § 465.  Suspended losses may be used to offset the taxpayers' pro rata share of any income earned by the partnership and/or other income in accordance with the operation of I.R.C. § 465.

> 8. To the extent the partnership earns net income the taxpayers' at risk will be increased in accordance with I.R.C. § 465
> . . . .

> 15. Any refund claim attributable to the operation of this agreement shall be deemed to be timely filed and shall be allowed if it is filed with the IRS within one year of the execution of this agreement by the Commissioner of Internal Revenue.

Section 465 of the Internal Revenue Code describes how deductions are to be limited by the amount at risk in the following manner:

> (a) Limitation to the amount at risk.--
> > (1) In general. – In the case of --
> > > an individual . . .

> > > engaged in an activity to which this section applies, any loss from such activity for the taxable

> year shall be allowed only to the extent of the aggregate amount with respect to which the taxpayer is at risk . . . for such activity at the close of the taxable year.
>
> (2) Deduction in succeeding year. – Any loss from an activity to which this section applies not allowed under this section for the taxable year shall be treated as a deduction allocable to such activity in the first succeeding taxable year.
>
> . . . .
>
> (c) Activities to which section applies. –
>
> (1) Types of activities. – This section applies to any taxpayer engaged in the activity of –
>
> (A) holding, producing, or distributing motion picture films . . . .
>
> (d) Definition of loss. – For purposes of this section, the term "loss" means the excess of the deductions allowable under this chapter for the taxable year . . . and allocable to an activity to which this section applies over the income received or accrued by the taxpayer during the taxable year from such activity. . . .

Currently, § 465 works in tandem with § 469. Section 469 provides that an individual may not deduct passive activity loss in excess of passive activity income. An activity is characterized as passive if it "involves the conduct of any trade or business . . . in which the taxpayer does not materially participate." § 469(c). Any unused passive loss may be carried over to the next tax year in which the individual has excess passive income. In *Bush II*, Judge Miller held that § 469, which became effective on January 1, 1987, applied to the losses asserted there, with the result that plaintiffs were barred from using passive activity losses and credits unless they could be applied to passive activity income. 84 Fed. Cl. at 95-96.

In its opening brief, defendant argued that *Bush II* controlled the outcome here, namely, that LWM losses could only be deducted against passive income for 1993-1995, and not against other income. As the taxpayers here point out, however, the Tax Reform Act ("TRA") of 1986 provided that its amendment to the passive loss and income provisions did not apply to "any loss, deduction, or credit carried to a taxable year beginning after December 31, 1986, from a taxable year beginning before January 1, 1987." Pub. L. No. 99-514, § 501(c)(2), 100 Stat. 2085, 2241 (1986) ("Special Rule for

Carryovers").    Prior to the TRA, there had been no generally applicable limitation on a taxpayer's ability to use losses based on their characterization as passive or non-passive. *See Lowe v. Commissioner*, 96 T.C.M. (CCH) 502, 505 (2008).

In its reply brief, defendant concedes that it was wrong: "Because of these exemptions [contained in the TRA,] any previously-disallowed LWM losses plaintiff[s] might be able to use in years after 1986 would not be subject to the passive loss limitation in § 469." Def.'s Reply 2.[4]  It contends that the outcome is unchanged, however, because § 465, which limits the losses that can be claimed for a particular activity to the at-risk amount for that activity, still requires that previously disallowed losses from an activity must first be used to offset any income from that partnership activity in a subsequent year. In other words, the taxpayers' previously-disallowed LWM losses first had to be used to offset their LWM income in 1993-1995.  Then any deduction tied to the suspended losses in excess of LWM income would have to correspond with an increase in plaintiffs' amount at risk.  The parties agree that plaintiffs' LWM amount at risk did not increase in 1993-1995.  Defendant contends therefore that, because the taxpayers' at-risk amount with regard to LWM did not increase in those years, taxpayers can only use the previously-disallowed LWM losses to offset LWM income received in 1993-1995, and not to offset other income.  This produces the same net result to plaintiffs' tax liability as the method which plaintiffs originally used on their return.

For 1993-1995, the taxpayers reported their LWM income as passive income pursuant to § 469, which was offset by their passive activity losses for those years.   Defendant contends that using previously-disallowed LWM losses to offset LWM income would not reduce the taxpayers' taxable income for those years, but only their passive income.  This would remove LWM income from taxpayers' passive income for those years and decrease the amount of passive losses they had to use and thereby increase the passive loss

---

[4]As it further concedes, the applicable regulations make this explicit: "Section 1.469-1(d)(2)(ix) of the regulations exempts from the operation of § 469 losses that were carried over from a pre-1987 year, pursuant to the carryover provisions in §§ 172, 613A, or 1212. Section 1.469-1(d)(2)(x) exempts from § 469 losses that were disallowed prior to 1987, pursuant to §§ 704, 1366, or 465." Def.'s Reply 2.

carryover to the following year.   It would not, however, according to defendant, create a net loss that could be claimed as a refund.

Defendant cites to proposed regulations that set out two ways in which deductions are allowable under § 465: 1) to the extent of income received from the activity in the taxable year; and 2) to the extent that the taxpayer is at risk if deductions exceed income.  *See* Prop. Treas. Reg. §§ 1.465-2(a), 1.465-11(c).  These proposed regulations were endorsed in *Allen v. Commissioner*, T.C. Memo. 1988-166, 1988 WL 34867 *10-11 (1988).  Defendant also cites commentators to the same effect.  In *Partnership Taxation,* Willis, Pennell, Postlewaite, Thomas Reuters, 2015, ¶ 7.05, at 1, for example, the authors state that

> if a loss is not allowed for a particular year . . . with respect to a specified activity by reason of the at risk provisions, the loss carries over and reduces income or increases the loss from *that* activity in the following year . . . .   If there were a second loss in the succeeding year . . . from that activity, the original . . . loss and the at risk limitation then would apply to the total of the two amounts. . . .

> . . . .  The only requirement is that a loss not permitted to be deducted under the at risk rules must be carried over and deducted in a later year with respect to the operation of the same activity.  The disallowed loss may be deducted with respect to the same activity in a later year against either: (1) the realization of a profit, or (2) an increase in the amount at risk through contribution of new capital or an increase in at risk partnership liabilities.

The net result, according to defendant, is that "The previously disallowed LWM losses can be used to offset plaintiffs' *non*-LWM income only to the extent those losses exceed the amount of LWM income in that year, *and* to the extent that plaintiffs' at risk amount was increased beyond the amount of income received." Def.'s Reply 5.  Because taxpayers do not allege that their amount at risk increased in those years, the excess losses would have to be carried over again and could not be applied to taxpayers' other income.

Part of defendant's reasoning is that, although § 469 did not take effect until after the suspended losses were generated, it does apply to the calculation of income and losses generated in 1993-1995. In those years, the LWM income that taxpayers received was reported as passive activity income. According to defendant, plaintiffs elected to offset their LWM passive activity income with passive losses from other sources. Defendant argues that the taxpayers cannot take a deduction pursuant to § 469 and at the same time use the income from the § 469 calculation to access losses suspended pursuant to § 465. According to defendant, plaintiffs are entitled to one deduction under either § 469 or § 465 based on the income, not two deductions operating under § 465 and § 469 separately.

Plaintiffs disagree with defendant's explanation of how § 465 operates in the absence of § 469. They argue that the standard IRS Forms 6198, 8582, and Schedule E of the Form 1040 permitted them to apply their suspended losses against other non-LWM income in 1993-1995. According to plaintiffs, they began in 1993[5] with suspended losses totaling $227,709. In 1993, LWM earned income of $11,167. This LWM income, per the taxpayers, frees up a corresponding amount of suspended losses and is reported on lines 1 and 5 of Form 6198 (At-Risk Limitations) as negative $216,542. All other lines on Form 6198 are either not applicable or zero. Even though plaintiffs' 1993 LWM income has been cancelled out by the suspended loss for purposes of Form 6198, the taxpayers contend that this effect is only for purposes of Form 6198. Plaintiffs explain that "[n]either § 465, the regulations, nor the Form 6198 instructions provide how the component parts ($11,167 of income and the allowable $11,167 of previously suspended 'at-risk' loss) are actually reported on Schedule E and then on Form 1040." Pls.' Suppl. Br. & Resp. to Def.'s Suppl. Br. 3. Instead, the taxpayers point to the 1993 Instructions for Form 6198, which provided, "[i]f the loss on line 5, Part I, is equal to or less than the amount on line 20, report the items in Part I in full on your return, subject to any other limitations such as the passive activity and capital loss limitations. Follow the instructions for your tax return." *Id*. Ex. UU at 7.

Plaintiffs next turn to Form 8582 (Passive Activity Loss Limitations), which the taxpayers filed in 1993. *See id.* Ex. VV. On this form, plaintiffs

---

[5] Plaintiffs' argument is the same for all three tax years at issues, 1993-1995, and while we only lay out the facts for 1993, our analysis for all three years is likewise the same.

report $16,976 of passive income, including $11,167 of income generated by LWM in that year. This form also shows that, in 1993, plaintiffs had $37,430 in passive losses[6] and carryover passive losses of $101,582. These passive losses were more than sufficient to offset the passive income. The result of the calculation suggested by Form 8582 is that the Mandiches have $16,976 of losses for use in 1993, $11,167 of which are allowable because of the passive LWM income that was also used to free up the suspended losses pursuant to Form 6198.

According to the taxpayers, this duplication is permissible because the 1993 Instructions for Schedule E direct that, "[i]f you have losses or deductions from a prior year that you could not deduct because of the at-risk or basis rules, and the amounts are now deductible, do not combine the prior year amounts with any current year amounts to arrive at a net figure to report on Schedule E. Instead, report the prior year amounts and the current year amounts on separate lines of Schedule E." *Id*. at Ex. BBB E-4. Accordingly, the taxpayers assert that their Schedule E line 27(g) (Passive loss allowed) would remain allowable and unchanged but that they would also be entitled to add $11,167 on line 27(i) (Nonpassive loss from Schedule K-1). This would change line 30 from negative $15,711 to negative $26,878, reflecting the additional $11,167 in deductible losses. The result in line 31 is a reduction of total partnership and S corporation income from $30,983 to $19,816. In this manner, the taxpayers assert that the tax forms support their interpretation of § 465 as permitting an additional deduction traceable to their LWM losses that were suspended by the terms of the LWM Closing Agreement.[7]

While a rigid adherence to the tax forms may produce the result that the taxpayers seek, the forms simply represent guidance and do not supersede the statute. Additionally, the forms were not written to address the precise circumstance that is identified in this case, namely, when § 469 does not apply to the suspended losses but § 465 does and the income generated is subject to both code sections. We are therefore unpersuaded by plaintiffs' reliance on the

---

[6] These passive losses are traceable to various activities other than LWM.

[7] On September 21, 2015, plaintiffs filed, without leave of the court, an additional supplemental brief that cited Treas. Reg. § 1.469-2T in support of their position. This regulation does not aid plaintiffs' theory of duplication but stands for the proposition that losses, which arose before 1987 and were suspended, "must be accounted for separately." Treas. Reg. § 1.469-2T.

tax forms to manufacture duplicated losses not allowed by the tax code.  In the absence of an increase in the amount at risk, § 465 bars any deduction tied to the suspended losses in excess of LWM income.

Defendant has convinced us that § 465 operates to limit plaintiffs' ability to use the suspended losses beyond their application to offset income from that activity in the current year.  Any exception to this limitation would be the result of an increase in plaintiffs' amount at risk.  Because there was no such increase in the amount at risk, plaintiffs may not use the suspended losses to offset income from sources other than the activity.  Although under this ruling plaintiffs would be able to shift which pool of losses are applied to offset their LWM income from the passive loss pool to the suspended loss pool, the bottom line does not change.  Either way, their income of $11,167 in 1993, $10,092 in 1994, and $20,469 in 1995 is offset by losses and thus not taxed.  Because plaintiffs' ultimate tax liability remains unchanged, we deny plaintiffs' request for refund in this respect.

## II.    Carryover Credits and Computational Adjustments

Mr. Mandich's original 1983 return claimed no credits against 1983 taxes, but it contained schedules showing available carryover credits of $104,572, consisting of carryovers from 1982; $29,206 from an investment tax credit, an energy investment credit of $24,000, and an increasing energy credit of $19,814, plus a new (in 1983) investment tax credit of $31,552, of which $31,188 was from Mr. Mandich's investment in LWM.  Pursuant to the LWM Closing Agreement, the allowable LWM tax credit was limited to $10,000.

In implementing the LWM Closing Agreement, the IRS, when calculating the tax credit carryovers from 1983 to make adjustments to taxpayers' returns for 1984 and 1990-1995, disallowed all prior credits which the taxpayers had attempted to carryover from 1983, other than a $364 credit, and a new (to 1984) credit of $788.  If the IRS had allowed the other carryover credits plaintiffs claimed, the Mandiches could have offset the taxes assessed pursuant to the LWM Closing Agreement's disallowance of over $200,000 in LWM losses.  Instead of applying the carryover credits against plaintiffs' increased tax bills in years 1984 and 1990-1995, the IRS disallowed all of the non-LWM credits.  It did this in 2000, at a time when those returns were otherwise not accessible to the IRS to make adjustments and assessments.

Specifically, under Internal Revenue Code §§ 6212 and 6213, which are contained in sub-chapter B "Deficiency Procedures," the IRS must mail a notice of deficiency to the taxpayer before assessing any levy or pursuing a proceeding in Tax Court. The IRS has a limited period of time, three years from the date the taxpayer filed its return, in which to mail a notice of deficiency and begin a proceeding against the taxpayer. § 6501(a). There is an exception, however, carved out under TEFRA for partnership adjustments made pursuant to an FPAA or, in this case, the implementation of a closing agreement accepting the results of the FPAA. § 6213(h)(3) (referring to § 6230). Section 6230(a) provides the following:

> (a) Coordination with deficiency proceedings.--
>> (1) In general.--Except as provided in paragraph (2) or (3), subchapter B ["Deficiency Procedures"] of this chapter shall not apply to the assessment or collection of any **computational adjustment**.
>> (2) Deficiency proceedings to apply in certain cases.--
>>> (A) **Subchapter B shall apply to** any deficiency attributable to–
>>>> (i) **affected items which require partner level determinations** (other than penalties, additions to tax, and additional amounts that relate to adjustments to partnership items), or
>>>> (ii) items which have become nonpartnership items (other than by reason of section 6231(b)(1)(C)) and are described in section 6231(e)(1)(B).
>>> (B) Subchapter B shall be applied separately with respect to each deficiency described in subparagraph (A) attributable to each partnership.
>>> (C) Notwithstanding any other law or rule of law, any notice or proceeding under subchapter B with respect to a deficiency described in this paragraph shall not preclude or be precluded by any other notice, proceeding, or determination with respect to a partner's tax liability for a taxable year.

§ 6230(a) (emphasis supplied).

19

The code further defines "computational adjustment" as "the change in the tax liability of a partner which properly reflects the treatment . . . of a partnership item.   All adjustments required to apply the results of a [partnership] proceeding . . . to an indirect partner shall be treated as computational adjustments." § 6231(a)(6).  Pursuant to § 6230, computational adjustments may be made to both partnership items and to some affected items. An affected item is "any item to the extent such item is affected by a partnership item." § 6231(a)(5); *see Keener v. United States*, 76 Fed. Cl. 455, 460-61 (2007).  Treasury Regulation § 301.6231(a)(5)-1(a), further provides:  "The term 'affected item' . . . . includes items unrelated to the items reflected on the partnership return (for example, an item, such as the threshold for the medical expense deduction under section 213, that varies if there is a change in an individual partner's adjusted gross income)."  An affected item may be altered by a computational adjustment if the adjustment does not require individualized, i.e., partner level, factual determinations.   26 U.S.C. § 6230(a)(2)(A)(i); *see Bush v. United States*, 655 F.3d 1323, 1330-31 (Fed. Cir. 2011) (("[A]ssessments are 'computational adjustments' when they require 'no individualized factual determinations' as to the correctness of the original partnership items or 'any other factual matters such as the state of mind of the taxpayer upon filing.'") (quoting *Olson v. United States*, 172 F.3d 1311, 1318 (Fed. Cir. 1999))).   The net result is that the IRS is authorized to make computational adjustments to items affected by partnership items so long as the adjustment does not require the IRS examiner to make a partner-level factual determination.

Both parties agree that only $31,188 of the $104,572 cache of tax credits was originally generated in 1983 by Mr. Mandich's investment in LWM and is therefore subject to a computational adjustment to effectuate the terms of the LWM Closing Agreement.[8]  Therefore, as taxpayers correctly point out, in the abstract, the IRS's disallowance of the taxpayers' claimed carryover credits from 1983, totaling $73,384, bears no necessary connection to the results of the LWM Closing Agreement.  The parties diverge, however,

---

[8] While the taxpayers do not dispute the fact that the credit created by their investment in LWM is subject to computational adjustment, the taxpayers do take issue with the IRS's alleged disallowance of all of that credit, including $10,000, which plaintiffs assert was preserved by the LWM Closing Agreement.

in their views about whether these pre-1983 carryover credits may be adjusted as affected items.

According to plaintiffs the IRS must accept the $73,384 figure as reported on their tax return and cannot challenge whether those credits were legitimate at the times they were claimed and repeatedly carried over from 1983 into following years.[9]  Plaintiffs' argument is this: any tax liability resulting from the disallowance of pre-1983 credit carryovers that was unrelated to LWM could not be assessed as a computational adjustment, first, because TEFRA did not go into effect until 1983, and, second, because the non-LWM credit carryovers are partner-level affected items requiring partner-level determinations and hence a deficiency notice.  In effect, according to the taxpayers, the maximum disallowance which could have been made was $21,188;[10] the critical adjustments were non-TEFRA adjustments and hence were invalid because they were made without a deficiency notice.

The government disagrees.  It claims that the $73,384 in carryover tax credits was disallowed in previous Tax Court proceedings and through earlier Tax Court settlements, and thus the IRS was merely giving effect to these determinations by way of computational adjustments when it implemented the LWM Closing Agreement.  In order to support its claim, defendant points to the 1993 Tax Court decision, which it reads as disallowing all tax credits claimed for 1982 pursuant to stipulation.  The sparse Tax Court record produced by the government in this case includes a stipulation and order whereby taxpayers agreed that the result to their Saxon Energy credits would be dictated by the resolution of *Schillinger v. Commissioner*, 60 T.C.M. (CCH) 1470 (1990).  It also included the taxpayers' closing agreement that settled

---

[9]Although the IRS presumably could have challenged the credits prior to the LWM Closing Agreement, it did not do so.  Instead, it waited until after the Mandiches' LWM partnership items were settled in 1999, and only then after plaintiffs attempted to use the credits.  Then it became clear the IRS took a different view of the Closing Agreement in terms of how the taxpayers could apply unused credits.  In that sense, they would appear to be partner-level items not protected by the "computational adjustment" exception.

[10] This $21,188 figure is the balance remaining once the $10,000 LWM investment credited permitted pursuant to the terms of the LWM Closing Agreement is subtracted from the $31,188 LWM investment credit originally claimed by the Mandiches.

their partnership issues regarding Summer Lovers Associates. Pursuant to that closing agreement, the taxpayers' Summer Lovers amount at risk, credits, and losses were reduced. At the close of the Tax Court case, the Mandiches were left with a tax deficiency of $9,811. According to the government, the only way that the Mandiches would have owed a tax bill at the end of that case was if all of their credits had been disallowed. This conclusion, per defendant, is consistent with the 1987 Examination Information Report and accompanying work papers, which shows that the IRS intended to disallow the Saxon Energy credits, the Summer Lovers credits, the Children's Classics Recording credit, and the Cocoa Ltd. credits. Thus, according to defendant, all partner-level factual determinations necessary to disallow all carryover credits were already made by the Tax Court, and therefore the IRS was simply making a computational adjustment when it disallowed the credits in 2000.

The problem with this evidence, according to plaintiffs, is that it is incomplete and is inconsistent with defendant's ultimate conclusion that no credits survived the judgment of the Tax Court. Specifically, plaintiffs take issue with the government's reliance on the Examination Information Report and work papers, because the adjustments proposed therein differ significantly from the result in the Tax Court. Taxpayers accurately point out that the examination report proposed a deficiency of $37,957 with penalties of $12,898 for 1982. By contrast, the Tax Court determined that the taxpayers owed $9,811 in taxes for 1982 plus penalties that amounted to approximately $5,000. Additionally, the examination report disallowed all of the taxpayers' $55,000 loss incurred in the Summer Lovers partnership, while the Summer Lovers closing agreement accepted by the Tax Court permitted $50,000 of loss to be used by the taxpayers. Finally, plaintiffs contend that the only evidence that defendant has provided to support its assertion that credits traceable to Children's Classics Recordings and Cocoa Ltd. were disallowed in their entirety is a proposal for settlement contained within the documents attached to the Examination Information Report.

Plaintiffs are correct that the record contains no evidence of how and when the credits from Cocoa Ltd. and Children's Classic Recordings were formally and finally disallowed. Furthermore, while we are persuaded from the Tax Court record that the Saxon Energy credits were disallowed, we are unable to match up the value that was disallowed with an identifiable part of the credits that were disallowed in the present adjustment. Moreover, the government's assertion that no credits survived the conclusion of the Tax Court case is squarely contradicted by the fact that the taxpayers retained a

$5,000 tax credit pursuant to the terms of the Summer Lovers closing agreement, which was accepted by the Tax Court.  There are significant limitations in the evidence before us such that we cannot trace the wholesale disallowance of the bulk of plaintiffs' pre-1983 carryover credits by computational adjustment in 2000 to specific instances in which each credit was previously disallowed by a competent authority.

The point is this: on the present record we would have to make partner-level factual determinations in order to untangle the mess of credits and previous legal proceedings to arrive at the conclusion that all pre-1983 carryover credits were previously disallowed.

Although in principal we do not disagree with the government's argument that applying the judgment of another court could be a computational adjustment to an affected item if the adjustment involved no partner-level factual determinations, we cannot reach that holding in this case because plaintiffs have shown that the IRS's adjustment to plaintiffs' carryover credits were not free from individual factual determinations.  By showing that the adjustment was not merely computational, plaintiffs have rebutted the presumption of correctness.  There is thus a failure of proof to support the government's argument that it did not need to file a notice of deficiency.[11]  If the government had preserved a more complete record, we might have been able to reach a different conclusion.

Because the IRS's disallowance of plaintiffs' pre-1983 carryover credits was not a computational adjustment, we hold that the disallowance was unlawful in the absence of a notice of deficiency.  The time in which the IRS could have issued a notice of deficiency has long since passed.  Plaintiffs are entitled to the use of $73,384 in credits to offset their tax deficiency computed as a result of the LWM Closing Agreement.[12]

---

[11] Neither party has suggested that this is a triable issue of fact.  The government has not suggested that it could offer live testimony on this issue, and we are satisfied that no further documentary evidence can be adduced beyond what the parties have furnished the court.

[12] Due to this holding, we find it unnecessary to address plaintiffs' alternative argument that the TEFRA exception to the deficiency procedures does not apply to pre-TEFRA items.

III.    Credits Attributable to LWM

The carryover credits are not the only credits that plaintiffs claim should have been available to offset their tax liability.  The taxpayers assert that, under the terms of the Closing Agreement, they were entitled to a $10,000 tax credit for their investment in LWM.  Plaintiffs rely on two provisions of the LWM Closing Agreement: "4.  The taxpayers' capital contribution to the partnership is $100,000.  5.  Taxpayers' qualified investment for computing investment tax credit is the amount at risk set forth in paragraph #4."  Pls.' Mot. Sum. J. Ex. E at 14-15.  In the year at issue, the investment credit was equal to 10% of the qualified investment.[13]  Thus, plaintiffs assert that they were entitled to a credit of $10,000, which is 10% of their $100,000 qualified investment and amount at risk.  Plaintiffs contend that the IRS's computational adjustment did not factor in this $10,000 credit and instead disallowed the entire original LWM credit of $31,188.

The government's rationale for opposing plaintiffs' request for a refund based on this assertion has morphed.  First, defendant claimed that the IRS had taken the $10,000 LWM investment credit into account while making the computational adjustment.  Then, defendant conceded that it could not point to any evidence that the IRS had, in its computational adjustment, applied the $10,000 credit against plaintiffs' tax deficiency, but defendant raised two additional arguments.  First, it argued that plaintiffs had not carried the burden of proof with respect to their entitlement to the $10,000 credit.  Second, it asserted that plaintiffs' claimed entitlement to the $10,000 LWM credit substantially varied from their initial administrative claim for refund.

As to the asserted failure of proof, defendant contends that plaintiffs have satisfied neither their burden of going forward nor their burden of persuasion with respect to the $10,000 investment credit because they did not produce evidence to show that the original $31,188 was attributable to LWM and thus that $10,000 of that credit should have been preserved according to the terms of th LWM Closing Agreement.  Defendant cites *Albemarle Corp. v. United States*, for the following:

---

[13] The parties do not dispute that "the allowable 1983 [investment tax] credit from the LWM Settlement would have been $10,000."  Pls.' Am. Compl. ¶ 13; Def.'s Answer to Pls.' Am. Compl. ¶ 13.

> [T]o rebut the presumption of the Commissioner's correctness, "the taxpayer must come forward with enough evidence to support a finding contrary to the Commissioner's determination." *Bubble Room, Inc. v. United States*, 159 F.3d [553], 561 [(Fed. Cir. 1998)]. Stated otherwise, to overcome the presumption, the taxpayer has the burden of presenting "substantial evidence as to the wrongfulness of the Commissioner's determination." *KFOX, Inc. v. United States*, 206 Ct. Cl. 143, 151-152, 510 F.2d 1365, 1369 (1975); *Arrington v. United States*, 34 Fed. Cl. 144, 147 (1995), *aff'd*, 108 F.3d 1393 (Fed. Cir. 1997). The burden imposed on a plaintiff is both the burden of going forward and the burden of persuasion. Thus, a plaintiff first must come forward with enough evidence to support a finding contrary to the Commissioner's determination. *See Transamerica Corp. v. United States*, 902 F.2d [1540] 1543 [(Fed. Cir. 1990)]; *Danville Plywood Corp. v. United States*, 899 F.2d [3,] 7-8 [(Fed. Cir. 1990)]; *Arrington v. United States*, 34 Fed. Cl. at 147.

118 Fed. Cl. 549, 562 (2014), *aff'd*, 797 F.3d 1011 (Fed. Cir. 2015). Defendant asserts that plaintiffs have not produced any evidence in this case to overcome the presumption of correctness and establish that the original disallowance of the full $31,188 credit was incorrect. According to defendant, the IRS work papers accompanying the adjustment do not identify the entity or entities that generated the $31,188 credit that was disallowed. In the absence of evidence that proves that all of the original $31,188 credit was attributable to LWM, defendant asserts that plaintiffs cannot establish that they are entitled to a $10,000 portion of that credit under the LWM Closing Agreement.

Plaintiffs respond by referencing § 6230(a), which limits computational adjustments, in the absence of a notice of deficiency, to partnership items or affected items that do not require partner-level factual determinations. According to plaintiffs, the $31,188 investment credit was either known to be a LWM partnership item that could be disallowed by computational adjustment without a notice of deficiency or it was an affected item and, in the absence of evidence linking the entire credit to LWM, the IRS auditor made a partner-level factual determination to disallow the entire credit without first issuing the requisite notice of deficiency. Plaintiffs argue that, if the government is correct that there was no evidence that the entire $31,188 credit corresponded

to its original investment of $311,874 in LWM, and the disallowance of this credit was not made in an effort to implement the terms of the LWM Closing Agreement, which reduced plaintiffs' LWM amount at risk from $311,874 to $100,000, then any adjustment, by definition, would require a partner-level factual determination and was therefore improper without a notice of deficiency.

Plaintiffs are correct that the government cannot have it both ways. Defendant cannot claim that the IRS's actions were procedurally sound in the past (i.e., did not trigger the notice of deficiency that is necessary when the adjustment requires partner-level factual determinations) and now assert that there is not enough evidence to conclude that the $31,188 credit was attributable to LWM. Either the IRS had sufficient evidence at the time of the adjustment to conclude that the $31,188 credit was a partnership item attributable to the taxpayers' investment in LWM, in which case a computational adjustment was appropriate, or the IRS did not have sufficient evidence to conclude that the credit was entirely attributable to LWM but made a partner-level factual determination and fully disallowed the credit, an action which should have been preceded by a notice of deficiency. In this case, the fact that the IRS fully disallowed the credit points to the IRS's understanding, at the time, that the credit was attributable to LWM. This follows logically from the documentation the taxpayers provided to the IRS and the figures that match up if the $31,188 credit was originally derived by computing 10% of $311,874.

The question thus becomes, why did the IRS examiner not make a computational adjustment to implement the terms of the LWM Closing Agreement that permitted $10,000 of the $31,188 credit and disallow the remaining $21,188? The government has not provided a rationale for why the full amount of credit was disallowed. In fact, defendant agrees that, under the terms of the LWM Closing Agreement, a $10,000 credit was allowable. Def.'s Answer to Pls.' Am. Compl. ¶¶ 13, 49. The only possible conclusion is that the IRS made a mathematical error that resulted, improperly, in the full disallowance of the LWM investment credit. We are satisfied that plaintiffs are entitled to this $10,000 investment credit to offset their tax liability.

Defendant, however, raises one last bar to plaintiffs' recovery. It asserts for the first time in its June 16, 2015 supplemental brief the defense of substantial variance.

26

The doctrine of substantial variance is rooted in the government's limitation on its waiver of sovereign immunity made in 26 U.S.C. § 7422(a) and the regulatory requirement that the claim for refund of tax "must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof." Treas. Reg. § 301.6402-2(b)(1). "Accordingly, new claims or theories raised subsequent to the initial refund claim are not permitted where they substantially vary from the theories initially raised in the original claim for refund." *Cencast Servs., L.P. v. United States*, 729 F.3d 1352, 1367 (Fed. Cir. 2013) (citing and applying 26 U.S.C. § 7422(a)).

According to defendant, plaintiffs' administrative claim did not alert the IRS to the issue of whether the $10,000 investment credit had been improperly disallowed. Plaintiffs' administrative claim states in relevant part:

> 1.    The settlement entered into by Closing Agreement provided there was no change to partnership items, but agreed that for purposes of determining the taxpayers' correct tax liability for every partnership year from inception to termination (i) the taxpayers' amount at risk regarding their Partnership investment would be determined based on several factors set forth in the agreement, (ii) "any deficiency in tax determined under this agreement will be subject to adjustments arising from a carryback or carryforward from other taxable years of loss, credit or other tax attributable as allowed by the Internal Revenue Code, . . . .
>
> 7.    The same grounds stated above apply to the assessments that were made based on the IRS' determination of adjustments or carryovers or carrybacks as affected items under TEFRA arising from the settlement years.

Pls.' Mot. Sum. J. Ex. O at 152-53. Defendant asserts that the $10,000 credit issue is not evident in the administrative claim, specifically in paragraph 7, because it "is not based on any IRS adjustment of any credit carryover utilized on plaintiffs' 1984 return." Def.'s Suppl Br. 15. Because plaintiffs did not clearly set forth their entitlement to the $10,000 LWM investment credit during the administrative stage, defendant concludes that their present pursuit fatally varies from their original claim.

In response, plaintiffs assert that the carryover credit grounds, of which the $10,000 LWM credit is one part, is expressly contained in the administrative claims. According to plaintiffs, the doctrine of substantial variance is not a bar for an issue that is "comprised within the general language of the claim." *Ottawa Silica Co. v. United States*, 699 F.2d 1124, 1138 (Fed. Cir. 1983).

We agree. There is ample evidence to suggest that the $10,000 LWM credit issue was included in the general language of plaintiffs' original administrative claim, the original complaints in these two case,[14] and in the amended complaint in the lead case.[15] Specifically, paragraph one of plaintiffs' administrative claim relies on the terms of the Closing Agreement to establish the proper treatment of partnership items and invokes the Internal Revenue Code to apply in the event that any loss, credit, or other tax may apply against any deficiency determined in the adjustment. Likewise, paragraph seven alerts the IRS to potential issues with adjustments that were made to carryover and carryback credits. As originally claimed, the $10,000 credit was part of a $31,188 credit that was not used in 1984 but carried forward. We cannot agree with defendant that the use of the terms "carryovers and carrybacks" do not embrace the $10,000 credit. Plaintiffs' administrative claim put the government on notice of the Mandiches' challenge to the computational adjustment made to credit carryovers and carrybacks. The doctrine of variance, thus, does not bar plaintiffs' recovery on this issue. Plaintiffs are owed a refund for the $10,000 LWM investment credit that was disallowed in error.[16]

---

[14] Plaintiffs used the same language in both their administrative claim and in the original complaints.

[15] In the amended complaint of the lead case, plaintiffs explicitly state their claim to the $10,000 credit. Pls.' Am. Compl. ¶¶ 9-13. The government did not raise the defense of variance in its answer to the amended complaint.

[16] Plaintiffs also challenge the government's defense of substantial variance on the basis of waiver. In light of our agreement with plaintiffs' position on variance, we find it unnecessary to consider this argument.

## CONCLUSION

Plaintiffs are entitled to a refund of taxes, interest, and penalties attributable to their pre-1983 carryover credits of $73,384 and the $10,000 LWM investment credit. The taxpayers, however, are not entitled to a refund for the sums associated with their suspended loss claims. Thus, plaintiffs' motion for summary judgment is granted in part and denied in part. Defendant's cross-motion is likewise granted in part and denied in part. The parties are directed to attempt to stipulate the amount of judgment in plaintiffs' favor and report the result to the court in a joint status report on or before December 11, 2015.


s/ Eric G. Bruggink
Eric G. Bruggink
Judge